Downey, Judge,
delivered the opinion of the court:
The submission is upon demurrer to the amended petition filed June 8, 1925, after the court had sustained a demurrer to the original petition. That petition seemed to us to be predicated on “ allocations,” and in a memorandum sustaining the demurrer it was said that “ allocations ” as made during the war did not constitute contracts.
*210 The amended petition contains other averments; the plaintiff disclaims reliance on an allocation, but declares it to be merely the evidence of a contract already consummated and tersely and correctly says that the demurrer raises but the one question, “ Does the petition state facts amounting in law to a contract between the Government and petitioner ? ”
The Dormer Steel Co., as it appears from the petition, was a corporation owning a large steel plant at Buffalo, N. Y., well equipped and fully organized for' the manufacture of plates and shell steel of the kinds needed by the United States during the war, doing a successful and profitable business and having on hand large quantities of raw materials which, because of climatic conditions and the closing of navigation during the winter, it was accustomed to lay in during the open season on the Great Lakes in sufficient quantities to supply its needs not only then but during the winter and spring following.
The petition recites the passage of the act of June 3, 1916, granting broad powers to the President through the head of any department to place obligatory orders, the creation of the Council of National Defense (act of August 29, 1916), the passage of the act of March 4, 1917, further empowering the President, the creation by the Council of National Defense of the War Industries Board, the creation of the steel division of that board, and the then demand for steel for various purposes in excess of the productive capacity of the steel plants.
That in March, 1918, J. Leonard Beplogel became the steel administrator of the War Industries Board charged with the duty of allocating and distributing orders for steel needed in all departments of -the Government, and that in September or early October of 1918 the War Industries Board, the steel division thereof, Major McCleary, the Ordnance Department member thereof, and Beplogel, the steel administrator, orally advised the petitioner that it should refrain from soliciting or accepting orders for commercial steel for delivery prior to July of the succeeding year that would interfere with maximum production of shell steel for the Government, and that the petitioner would shortly receive *211 formal orders for 50,000 or 60,000 tons of shell steel, and it should from that time forward devote all of its facilities to the manufacture of projectile steel for the Government. Also that at the same time it was orally advised and instructed that it should proceed to eliminate the manufacture of plates so as to increase its production of shell steel to the maximum, and that it would shortly receive sufficient orders to take care of its output to July of the succeeding year, and that it would not be permitted to dispose of steel except as the same might be allocated to such Government work as the War Industries Board might dictate. That the petitioner accepted the mandate and direction of the said War Industries Board and its allied agencies and placed at the disposal of the United States its entire plant, organization, equipment, supplies, etc.
Following these general averments and coming to what is treated as its first cause of action the receipt is alleged of an “ allocation order,” so called, from the committee on steel distribution of the American Iron and Steel Institute which, it is alleged, was “ a voluntary association consisting of American citizens familiar with the steel trade, who acted as technical advisers to the said War Industries Board, the steel division thereof, and the Ordnance Department of the United States.”
This allocation was of 11,850 tons of steel, which it is said the committee apportions the Donner Steel Co., and it concludes with the statement, “ the War Industries Board has been advised of this allocation, and we understand you will complete your negotiations with Army ordnance in the usual manner.”
Alleging that at the time of the receipt of this allocation the petitioner had reserved and dedicated to the manufacture of steel for the United States large'quantities of named raw materials as well as its plant facilities and personnel, the armistice is recited followed by notice from the Chief of Ordnance that while it had been the intention to place an order for this steel the board of review had disapproved the purchase and “ consequently contract will not issue.” The petitioner was ready, willing, and able to manufacture this steel, but was not permitted to do so and by reason *212 of the facts alleged it had no commercial orders on which to use the raw materials which it had on hand and had dedicated to the Government’s steel program, and damages-are alleged in the sum of $230,023.94.
After reciting the passage of the Dent Act, the filing of a claim thereunder with the Secretary of War, and its rejection, it is alleged that by reason of the matters and things-set out in this count of its petition, it did, prior to November 11, 1918, make an informal contract with agencies, of the United States within the purview of that .act and that said contract was performed in part by the petitioner..
So lengthy a summarizing of a petition in itself much; more voluminous may seem unnecessary, perhaps unjustified.. The purpose in thus collating and reviewing all the allegations of the petition which presumptively the pleader regards as material is to ascertain whether there may be found, therein justification for the conclusion that there was either-a formal contract or an informal contract within the purview of the Dent Act. The careful scrutiny given the whole case as presented by the petition in so far as it relates to-the first cause of action fails to develop the essential elements of a contract, however informal.
If the facts alleged might otherwise be construed as sufficient for the purpose, we can not lose sight of the fact-that the “ agencies ” with which the plaintiff alleges it dealt were not contracting agencies. They not only had no power ■ to contract, but did not in fact assume to exercise such a. power. They no doubt had authority to do what they did do, but eliminating the important question of authority to-contract, they did not in fact make or assume to make any-contract.
The functions of these different “agencies” whose acts-are relied upon are so set up in the petition that if those averments were conclusive rather than the law itself the authority necessary is lacking.
, The President is not alleged to have placed any order-under powers given him in acts cited. The Council of National Defense, it is said, “ was created for the coordination of industries and resources for the national security and. welfare,” etc., with authority to organize subordinate bodies.. *213 The Council of National Defense created the War Industries Board, the powers and duties of which are alleged but with a total absence of contracting authority, and which it is said was, for the more efficient discharge of its duties, divided into sections, one of which was the steel section, of which Beplogel was a member and became the steel administrator charged with the duty on behalf of said board, as it is alleged, of allocating and distributing Government orders for steel needed by any and all departments of the Government, to which it should be added that an allocation was a necessary prerequisite to the furnishing of any steel on nontract or order.
The War Industries Board, the steel division thereof, the Ordnance Department member thereof and said Beplogel, the steel administrator, are the agencies which it is alleged in September, or October of 1918, “ orally advised the petitioner ” that it should refrain from soliciting or accepting •orders for commercial steel for delivery before July of the succeeding year that would in any way interfere with maximum production for the Government and that it would shortly receive formal orders for 50,000 or 60,000 tons of ■shell steel. This general allegation is perhaps more pertinent to the second cause of action but it is here averred and is ■apparently the basis for the allegation that it had dedicated its stock of materials, plant, etc., to the Government’s steel program pursuant to the mandate of said agencies and its acceptance thereof.
But if there is anything in this allegation as to the conduct of these agencies which savors in any degree of a contractual obligation the nearest thereto is to be found in the statement that the petitioner would shortly receive orders for a stated quantity of steel construed as a promise, and if that construction were tenable it could amount to no more than a verbal promise to contract, which falls far short of a contract even if the promisor had the authority ultimately to contract.
But the first cause of action is more particularly predicated on a failure to receive a contract for 11,850 tons of steel as to which it had received an allocation.
*214 Reliance on the allocation as a contract is disclaimed, and it is said that it is asserted “ as evidence of the existence of a contract already consummated.” The proposition is refuted by the allocation itself which clearly recognized that no contract existed by stating that “ we understand' you will complete your negotiations with Army ordnance in the usual manner.” This was from a committee of citizens acting purely in an advisory capacity because of the familiarity of its membership with the steel industry and the ability of different plants to supply needs, a body which could scarcely furnish competent evidence of the existence of a Government contract, but if this allocation had come from the steel section of the War Industries Board or from the steel administrator himself, it was but an allocation, an authority to the Donner Steel Co. to contract with the Ordnance Department for and to deliver on such a contract the stated amount of steel, a necessary prerequisite under necessary war-time regulations. The contemplated contract for this .quantity of steel was, as shown by the petition, never made, and in the face of the statement appearing in the petition by the Chief of Ordnance, that it was not made because reviewing authority had disapproved the purchase, it seems a hopeless task to attempt to erect out of the circumstances an informal contract under the Dent Act.
In support of the second cause of action the same general averments summarized above are repeated, embracing the first 12 paragraphs of the petition, in addition to which it is alleged that after the creation of the War Industries Board it was notified by the steel administrator, acting for and in behalf of the War Department, as well as other agencies, that the Y/ar Department’s requirements for steel for artillery projectiles up to July 1, 1919, were in excess of the capacity of the steel manufacturers and that because of existing critical state of hostilities in Europe it was essential that petitioner’s plant be reserved for and dedicated to Government requirements and that it was the intent and purpose of the War Industries Board, the steel division thereof, and its steel administrator, acting for and on behalf of the Secretary of War and other departments, to exact of petitioner exclusive use of its plant, etc., and that it *215 would have to accept from the War Industries Board and other agencies orders for Government material to the exclusion of other customers and that it would not be permitted to fill any commercial orders prior to the 1st day of July, 1919, that would interfere with production for the Government.
It is then averred that the petitioner agreed with the War Industries Board and the steel division thereof, acting as procurement agencies for the War Department, that it would reserve for and dedicate its plant, equipment, personnel, raw materials, etc., to the requirements of the Wai Department which, it avers, that, in consideration of said mutual agreement, it did. The averment is repeated with reference to its being informed by the stated agencies that it would receive orders for steel, but stated at 40,000 to 50,000 tons instead of 50,000 to 60,000 tons, to which it is added that the Ordnance Department members of the industries board and of its steel committee stated that petitioner would receive formal contracts for said steel.
It is said that after the armistice the War Department and the War Industries Board failed and refused to make further allotments to it “ and repudiated and breached the aforesaid contract for the manufacture of 40,000 to 50,000 tons of steel,” by reason of which it alleges, by appropriate averments, a damage in the sum of $1,333,921.68.
This claim also, it is alleged, was filed with the Secretary of War under the Dent Act and disallowed.
The distinguishing features of the second cause of action have been summarized rather as an aid to clear understanding than because they induce any different conclusion.
The specific agreement alleged seems to be an agreement with the War Industries Board and the steel division thereof to reserve its plant and dedicate it to Government work, but all the averments taken together repudiate the idea that these agencies were entering into a contract with the petitioner for the exclusive use of its plant even if there was authority in them to make such a contract, which there was not. They are referred to as acting as “ procurement ” agencies for the War Department, not contracting agencies.
*216 But the breach declared upon is not of this alleged contract but of the “ contract for the manufacture of 40,000 to 50,000 tons of steel,” which it was said was “ repudiated and breached.” The most that can be said as foundation for such a contract is that certain agencies having no power to contract informed the petitioner that it would receive orders for this quantity of steel. The statement seems to preclude necessity for discussion. There is not shown to have been any such contract either formal or informal within the purview of the Dent Act.
There is no cause of action stated. It is therefore adjudged that the demurrer be sustained and the petition dismissed.
Graham, Judge; Hay, Judge; Booth, Judge; and Campbell, Chief Justice, concur.